IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

A. Huda Farouki,
9005 Old Dominion Drive
McLean, VA 22102

            **Plaintiff,**

    v.

Petra International Banking Corp.
Petra Bank
Randolph B. Old,

            **Defendants.**

Civil Action No.

## COMPLAINT

Plaintiff A. Huda Farouki, by his undersigned counsel, hereby brings suit against Petra International Banking Corp. ("PIBC"), Petra Bank, and Randolph B. Old (collectively "Defendants") and alleges as follows:

### INTRODUCTION

1. Defendants have initiated an unlawful and wrongful campaign to seize assets from Plaintiff A. Huda Farouki ("Mr. Farouki") in connection with a debt that was satisfied fifteen years ago. The campaign proceeds in both the United States of America, where the debt was retired and where Mr. Farouki is a citizen and resident, and in the Hashemite Kingdom of Jordan ("Jordan"), where Petra Bank is located. In March 2007, Defendants purportedly attempted to collect on this alleged debt in the United States. In June 2008, Defendants were successful in seizing certain of Mr. Farouki's personal property as it was being shipped into Jordan. In October 2008, Defendants attempted to collect on this alleged debt in the United

States. Defendants claim that their collection efforts will continue indefinitely.

2.  The allegedly outstanding debt was structured in 1986 as a loan of several million dollars from PIBC to a company controlled by Mr. Farouki called American Export Group International Services, Inc. or "AEGIS" (the "AEGIS Loan"). Mr. Farouki signed a contemporaneous personal guaranty for the repayment of the AEGIS Loan (the "AEGIS Guaranty"). The AEGIS Guaranty was secured by a deed of trust on Mr. Farouki's residence at 9005 Old Dominion Drive, McLean, Virginia 22102 (the "Property"). The AEGIS Loan and the AEGIS Guaranty were negotiated and executed in the District of Columbia and are expressly governed by the laws of the District of Columbia.

3.  AEGIS filed for bankruptcy in 1987. Over the next five years, AEGIS attempted to formulate a viable reorganization in conjunction with PIBC. During that period, AEGIS, Mr. Farouki, and PIBC made a series of modifications to the AEGIS Guaranty based upon new secured lending arrangements. The parties agreed that Mr. Farouki would be released from the AEGIS Guaranty and the deed of trust on the Property after he satisfied certain conditions relating to AEGIS' ongoing reorganization, including applying his best efforts to collect AEGIS' outstanding receivables. As a result of a number of factors, including PIBC's failure to provide additional funding through the secured lending arrangements, the reorganization was ultimately unsuccessful.

4.  Between 1989 and 1993, Mr. Farouki satisfied the terms for release of both the deed of trust and the AEGIS Guaranty. In 1990, PIBC released the deed of trust. In 1993, PIBC released the AEGIS Guaranty. More specifically, in 1993, PIBC entered an agreement with Mr. Farouki pursuant to which PIBC released the AEGIS Guaranty in consideration for his ongoing efforts to collect certain receivables and in exchange for Mr. Farouki's release of all claims

against PIBC relating to the bank's failure to honor its lending agreements with AEGIS during its reorganization efforts.

5. Between the years of 1993 and 2007, Defendants made no effort to collect on the AEGIS Guaranty. Defendants sent no statement of account, demand letter, or notice of outstanding balance to Mr. Farouki. Now, in 2008, Defendants have enlisted administrative agencies of the Jordanian government, including the Department of Customs Services, to seize property belonging to Mr. Farouki in Jordan pursuant to martial law. Despite the fact that the performance of both the AEGIS Loan and the AEGIS Guaranty is expressly governed by the laws of the District of Columbia, Defendants have never sought redress for this allegedly outstanding loan through legal processes in the United States. Instead, Defendants have elected a course of action designed to avoid United States judicial involvement and deprive Mr. Farouki of his rights under United States law.

6. This action seeks a declaratory judgment from the Court decreeing that the alleged debt has been satisfied and released, the statute of limitations prevents any legal action by Defendants to collect on the alleged debt, and Defendants are equitably estopped from collecting on the alleged debt by the doctrine of laches. This action further seeks an injunction prohibiting Defendants' future efforts to collect on the alleged debt. Finally, this action seeks damages from Defendants resulting from their collection efforts and damages from Defendant Randolph B. Old resulting from, among other things, the injurious falsehoods and defamatory statements he has pronounced in declaring that this debt remains outstanding.

## PARTIES

7. Mr. Farouki is of Jordanian descent, and is a citizen of the United States of America. He is a resident of the Commonwealth of Virginia and has been so since 1971. Mr.

Farouki is an entrepreneur who has founded and controlled several businesses based in the United States, including AEGIS.

8. PIBC is the United States based subsidiary of Petra Bank. PIBC was chartered in the United States in 1983 pursuant to the Edge Act, 12 U.S.C. § 611, for the purpose of engaging in international and foreign banking and financial operations. From 1984 to November 1993, PIBC conducted its banking operations from offices at 1901 K Street, N.W. Suite 201 in the District of Columbia. Petra Bank owned approximately 70% of PIBC's stock in August 1989 when the Central Bank of Jordan assumed control of both PIBC and Petra Bank pursuant to Jordanian martial law. On information and belief, in 1993, PIBC's assets were sold in bulk to Petra Bank and PIBC ceased its day-to-day banking operations. PIBC continues to operate, however, including assisting Petra Bank with debt collections, and continues to maintain a Federal Reserve listed business address at 904 Dreams Landing Way, Annapolis, Maryland. The property is owned by Randolph B. Old.

9. Defendant Petra Bank is a Jordanian bank that began operations in 1977. It is the parent company of PIBC. Petra Bank and PIBC were taken over by the Central Bank of Jordan in August 1989. The Central Bank assumed responsibility for Petra Bank's debts and deposits and initiated a process of liquidation that is still ongoing. Before the takeover by the Central Bank, Petra Bank was engaged in substantial banking activities within the United States, both through its United States subsidiary, PIBC, and through its direct commercial activities. Those activities continued after the takeover and continue to the present. Petra Bank is located in Amman, Jordan.

10. Defendant Randolph B. Old ("Mr. Old"), on information and belief, was appointed by Petra Bank's management committee as General Manager of PIBC in

approximately 1991. He has retained that title ever since. Until at least November 1993, Mr. Old managed PIBC from the bank's offices in the District of Columbia. On information and belief, from the time that PIBC ceased its day-to-day banking operations, in or around 1993, until the present, Mr. Old's principal responsibility has been to undertake debt collections on behalf of Petra Bank. On information and belief, Mr. Old receives a commission on all collections. Mr. Old currently resides in Vero Beach, Florida. Another of Mr. Old's properties is the current registered business address of PIBC.

## ADDITIONAL RELEVANT ENTITY

11. AEGIS was a Delaware company controlled by Mr. Farouki and several other shareholders from approximately 1973 to 1993. AEGIS was a large, private provider of international procurement, transportation, contract implementation, and construction services. In April 1987, AEGIS filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. In July 1993, the reorganization was converted to a Chapter 7 proceeding and AEGIS' remaining assets were liquidated.

## JURISDICTION AND VENUE

12. As described in paragraphs 13-15, this Court has jurisdiction over the subject matter of this controversy pursuant to the laws of the United States.

13. First, PIBC was incorporated under the Edge Act, a federal law that authorizes the chartering of a corporation "for the purpose of engaging in international or foreign banking or other international or foreign financial operations." 12 U.S.C. § 611. As such, this action arises under the laws of the United States and this Court is vested with original jurisdiction by 12 U.S.C. § 632.

14. Second, subject matter jurisdiction is conferred by the general diversity-of-

citizenship statute, 28 U.S.C. § 1332, because the action involves a controversy exceeding $75,000 between citizens of different states and in which citizens or subjects of a foreign state are additional parties.

15.     Third, to the extent that Petra Bank is determined by this Court to be an agent or instrumentality of Jordan, both the personal and subject matter jurisdiction of this Court are conferred by the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(1) and (2) and 28 U.S.C. § 1330(a) and (b) because, as alleged in more detail below, this action arises out of commercial activity to which sovereign immunity is no defense and further because Petra Bank has waived sovereign immunity in this controversy by seeking to enforce a contract entered into within the District of Columbia and expressly governed by the laws of the District of Columbia.

16.     Personal jurisdiction over Defendants is further conferred by Fed. R. Civ. P. 4(k)(1) and D.C. CODE §§ 13-423(a) and 13-334(b) because the claim for relief relates to the Defendants' transacting business in the District of Columbia and relates to a contract entered into within and governed by the laws of the District of Columbia.

17.     Venue is proper in this judicial district because a substantial part of the events giving rise to the claims occurred in the District of Columbia.

## FACTS

18.     Mr. Farouki formed AEGIS in 1973 to engage in the business of exporting construction materials, housing materials and systems, medical equipment and complete hospitals including equipment, furnishings and supplies. Materials and services were sold to government and private sector clients throughout the world.

19.     In the mid-1980s, AEGIS experienced financial difficulties in connection with ongoing construction projects in Saudi Arabia and sought financing from PIBC. On November

12, 1986, AEGIS entered a secured credit facility agreement with PIBC for the extension of $3.7 million dollars in financing and, in connection with this agreement, executed a promissory note (defined above as the "AEGIS Loan"). Also on November 12, 1986, Mr. Farouki signed a personal guaranty for the repayment of the AEGIS Loan (defined above as the "AEGIS Guaranty"). The AEGIS Guaranty was also signed by a second guarantor, Ali T. Farouki.

20. The AEGIS Loan and the AEGIS Guaranty both state that their "performance and construction" are "governed by the internal laws of the District of Columbia." The AEGIS Loan agreement further states that the representations made by any party "shall be deemed to include the successors and assigns of such party."

21. On November 23, 1986, Mr. Farouki entered into a deed of trust that provided his personal residence as collateral for the AEGIS Loan and the AEGIS Guaranty.

22. Additional collateral supporting the AEGIS Loan included claims that the AEGIS estate had against various governmental and business clients for work performed under contract. Some of the key collateral included receivables for: (a) work performed on the U.S. Embassy in Moscow, (b) work performed on various military housing that AEGIS constructed for the U.S. Army Corp of Engineers throughout Germany; (c) a termination-for-convenience the U.S. government had implemented with regard to construction of the Camp Darby military base in Italy; (d) AEGIS' work in constructing military housing in Cuba for the United States government; (e) the sale of an AEGIS subsidiary in New Jersey; and (f) various collateral claims against joint venture partners.

23. On April 30, 1987, AEGIS filed for bankruptcy protection in the United States Bankruptcy Court for the District of Columbia under Chapter 11 of the U.S. Bankruptcy Code. On July 28, 1989, AEGIS filed a plan of reorganization with the bankruptcy court. That plan of

reorganization was dependent upon continued financing from AEGIS' principal lender, PIBC. PIBC provided post-petition financing to AEGIS on numerous occasions until it was taken over by the Central Bank. AEGIS' need for ongoing financing was described in its 1989 plan of reorganization:

> Debtor [was] an independent export trading company which routinely obtained large procurement contracts, needed access to credit as it was required to obtain bid bonds to demonstrate its intent in bidding on projects and to later obtain performance bonds to assure performance after the contracts were awarded and . . . many of Debtor's suppliers normally required commercial letters of credit.

24. Prior to and during AEGIS' bankruptcy, AEGIS made periodic payments to PIBC in repayment of the AEGIS Loan.

25. In August 1989, while AEGIS was in bankruptcy proceedings and attempting to reorganize, the Central Bank of Jordan, pursuant to martial law, assumed control of Petra Bank in Jordan and PIBC in Washington, D.C. amid allegations of mismanagement at Petra Bank in Jordan. The Central Bank replaced many of Petra Bank's and PIBC's officers and directors and new management committees were established.

26. Banking operations continued at both institutions after the takeover. On a regular basis, PIBC management consulted or sought approval from Petra Bank's management committee with respect to various PIBC business decisions. However, within a short time after the takeover, Petra Bank withdrew its financial support of PIBC's ongoing banking operations. Consequently, it became increasingly difficult for AEGIS to obtain funds for its operations, even under its pre-existing credit facility.

27. In and around this same time period, in 1989, Mr. Farouki participated in a series of negotiations with PIBC concerning the release of the deed of trust on the Property and the

release of the AEGIS Guaranty. The parties ultimately reached an agreement concerning the release of both instruments.

28. In order for the deed of trust to be released, PIBC was to receive $500,000 applied to AEGIS' pre-bankruptcy debt from sources other than AEGIS' post-bankruptcy receivables. This condition was satisfied in 1989 and the deed of trust was released in or around April 1990.

29. The conditions precedent to the release of the AEGIS Guaranty included (1) Mr. Farouki's continued employment with AEGIS; (2) his continued efforts to rehabilitate AEGIS, including filing a plan of reorganization with the bankruptcy court that met PIBC's approval; and (3) Mr. Farouki's assistance in the collection of AEGIS receivables for the benefit of PIBC.

30. PIBC placed primary importance on the third of these conditions and Mr. Farouki led an aggressive effort to collect the AEGIS receivables. In exchange for Mr. Farouki's efforts to collect AEGIS receivables, PIBC also agreed to pay Mr. Farouki between 40-50% of all collections. That effort was very successful. Funds were collected on every claim. The funds totaled several million dollars. Between 1991 and 1993, Mr. Farouki satisfied PIBC's terms for the release of the AEGIS Guaranty although there was disagreement among the parties concerning when these conditions were met.

31. On information and belief, in or around 1991, Mr. Old was appointed by Petra Bank's management committee to be General Manager of PIBC in Washington, D.C..

32. Between 1991 and 1993, negotiations concerning the release of the AEGIS Guaranty continued between Mr. Farouki and Mr. Old. These negotiations transpired through in-person meetings, the exchange of letters, and at least one draft settlement and release agreement. During the negotiations, it was agreed that Mr. Farouki's only remaining obligation with respect to the AEGIS Guaranty was to continue to assist in collecting AEGIS receivables and to file a

satisfactory plan of reorganization with the bankruptcy court. PIBC and Mr. Old initially resisted settlement, asserting that several receivables remained outstanding and they wanted to ensure that Mr. Farouki would assist in the collection of those receivables. In short, no one disagreed about what was required for the release of the AEGIS Guaranty, only about whether enough of the activities relating to collection and finalizing the plan of reorganization had been completed.

33. In 1992, AEGIS was finalizing a new plan of reorganization in consultation with PIBC. The plan was dependent upon continued financing from PIBC. By the end of 1992, however, Petra Bank and PIBC had reduced their operations even further and were accelerating their respective liquidations. In 1993, PIBC notified AEGIS that it would not support AEGIS' plan of reorganization as originally agreed. On July 23, 1993, PIBC and AEGIS jointly agreed to convert AEGIS' Chapter 11 reorganization to a Chapter 7 liquidation.

34. At that point, Mr. Old and PIBC agreed to and did release Mr. Farouki from the AEGIS Guaranty based on his ongoing assistance in the collection of AEGIS' receivables and Mr. Farouki's agreeing to release all of his and AEGIS' claims against PIBC relating to its failure to provide additional, needed funding during the reorganization. The release of the AEGIS Guaranty was confirmed in a written document from Mr. Old to Mr. Farouki. After the passage of fifteen years, Mr. Farouki is currently unable to locate the written document. In reliance on this agreement, however, Mr. Farouki and AEGIS continued to assist in the collection of receivables and did not file any legal action against PIBC.

35. During the liquidation of AEGIS, PIBC agreed to sell all of AEGIS' remaining physical assets and goodwill to Mr. Farouki and a company under his control doing business as American International Services or "AIS."

36. On information and belief, in or around 1993, PIBC's remaining assets were sold in bulk to Petra Bank.

37. Mr. Farouki has lived at the same address in Northern Virginia for over thirty years. The address is known to Mr. Old and PIBC. During the period from 1993 to 2007, Defendants did not issue any demand letters, statements of account, notifications of indebtedness, or other indicia of any continuing alleged debt owed by Mr. Farouki. Similarly, no notification of indebtedness was provided to the second guarantor of the AEGIS Loan, Ali T. Farouki.

38. In the mid-1990s, Mr. Old continued to conduct business with Mr. Farouki and Mr. Farouki's companies. Mr. Farouki invested in an entity with which Mr. Old was affiliated called Rudd Industries. Mr. Farouki invested substantial sums in Rudd Industries even though he knew the company was indebted to PIBC and a substantial portion of this investment was utilized to satisfy Rudd's obligation to PIBC.

39. Petra Bank now asserts that Mr. Farouki owes it approximately $12 million in debt relating to the AEGIS Guaranty. This amount includes fifteen years of accrued interest.

40. Acting on behalf of Petra Bank, in June 2008, the Jordanian Department of Customs Services seized certain property belonging to Mr. Farouki as it was being shipped into Jordan.

41. Agents of Mr. Farouki attempted to retrieve his property in Jordan and to ascertain the purpose of its seizure. To that end, in July 2008, they met with the General Manager of Petra Bank, Nafeth Abdul Al-Fattah. Al-Fattah asserted that the AEGIS Guaranty was validly assigned by PIBC to Petra Bank in or around 1993. He further reported that Petra Bank was attempting to collect on the AEGIS Guaranty based on information provided by Mr.

Old who alleged that the AEGIS Guaranty remained outstanding.

42. During this meeting, Al-Fattah produced from his files a purported "Indebtedness Notification" demanding payment from Mr. Farouki on the AEGIS Guaranty. The document was dated March 28, 2007, and addressed to Mr. Farouki at an office building in Reston, Virginia, that was vacated by AEGIS in or around 1993. Mr. Farouki had no knowledge of the document's existence until it was produced by Petra Bank in July 2008.

43. On or around October 26, 2008, Mr. Farouki received the "Indebtedness Notification" dated March 28, 2007 in the mail at his current business address in Reston, Virginia.

44. The property seized from Mr. Farouki remains in the custody of the Jordanian Department of Customs Services.

45. Mr. Old continues to assert to Petra Bank that the AEGIS Guaranty was never released.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment
### Release of Personal Guaranty

46. Plaintiffs reallege and incorporate paragraphs 1-45 as if fully set forth herein.

47. During AEGIS' reorganization, the terms of the AEGIS Guaranty, and particularly the conditions for the release of the guaranty, were renegotiated multiple times by Mr. Farouki and Defendants.

48. The conditions for the release of the guaranty were ultimately agreed upon and consisted of: (1) Mr. Farouki's continued employment with AEGIS; (2) Mr. Farouki's assistance in the collection of AEGIS receivables for the benefit of PIBC; and (3) his continued efforts to

rehabilitate AEGIS, including filing a plan of reorganization with the bankruptcy court that met PIBC's approval.

49. Mr. Farouki satisfied the first two of these conditions. When it became clear that PIBC could not financially support AEGIS' modified plan of reorganization, PIBC agreed that the final condition was no longer applicable. PIBC then agreed to and did release Mr. Farouki from his guaranty in exchange for his and AEGIS' continued efforts to collect receivables and the release of all claims relating to PIBC's failure to provide ongoing funding to AEGIS in accordance with the parties' prior agreement.

50. After PIBC released Mr. Farouki from any further obligations under the AEGIS Guaranty, Mr. Old sent a written document to Mr. Farouki confirming the release.

51. Although, after the passage of fifteen years, the written document cannot currently be located, District of Columbia law permits a court to consider parol evidence to establish both the contents and the existence of a writing that was subsequently lost.

## COUNT II
### Declaratory Judgment
### Statute of Limitations

52. Plaintiffs reallege and incorporate paragraphs 1-51 as if fully set forth herein.

53. The AEGIS Loan and AEGIS Guaranty were executed on November 12, 1986. They are expressly governed by the laws of the District of Columbia.

54. Prior to and during AEGIS' bankruptcy, AEGIS made periodic payments to PIBC in repayment of the AEGIS Loan. The AEGIS Loan and all related and resulting claims were finally extinguished in bankruptcy proceedings in 1993 when AEGIS was liquidated. The AEGIS Guaranty was released in 1993. The final post-release collection on AEGIS receivables occurred in 1996 and was remitted to PIBC. Accordingly, no payments have been made in

repayment of either obligation in approximately twelve years. No statement of account was received by Mr. Farouki or AEGIS from 1993 to the present date.

55. In the twelve years or more since the last payments were made in repayment of the AEGIS Loan or the AEGIS Guaranty, Defendants have never initiated any legal action in the United States to collect on either the AEGIS Loan or the AEGIS Guaranty.

56. Due to the passage of time, the three-year statute of limitations for a cause of action based on a simple contract codified in Section 12-301 of the District of Columbia Code has run. Accordingly, a legal action to enforce or collect on the AEGIS Guaranty is time-barred.

## COUNT III
### Declaratory Judgment
### Laches

57. Plaintiffs reallege and incorporate paragraphs 1-56 as if fully set forth herein.

58. The AEGIS Loan and AEGIS Guaranty were executed on November 12, 1986. They are expressly governed by the laws of the District of Columbia.

59. Prior to and during AEGIS' bankruptcy, AEGIS made periodic payments to PIBC in repayment of the AEGIS Loan. The AEGIS Loan and all related and resulting claims were finally extinguished in bankruptcy proceedings in 1993 when AEGIS was liquidated. The AEGIS Guaranty was released in 1993. The final post-release collection of AEGIS receivables occurred in 1996 and was remitted to PIBC. Accordingly, no payments have been made in repayment of either obligation in approximately twelve years.

60. Mr. Old and PIBC agreed to release Mr. Farouki from the AEGIS Guaranty based on his continued efforts to collect AEGIS receivables and based on Mr. Farouki's agreeing to release all of AEGIS' claims against PIBC relating to its failure to provide additional, needed funding during AEGIS' reorganization in accordance with the prior agreement of the parties. In

reliance on this agreement, Mr. Farouki continued to collect AEGIS receivables and abstained from initiating any legal action against PIBC.

61. Mr. Farouki has lived at the same address in Northern Virginia for over thirty years. The address is known to Mr. Old and PIBC. Mr. Old has been aware of Mr. Farouki's primary business office since 1991, which remains in the same location, having visited the office numerous times including during several years when Mr. Old arranged for Mr. Farouki to invest in a company affiliated with Mr. Old that owed funds to PIBC. During the period from 1993 to 2008, Mr. Farouki did not receive any demand letters, statements of account, notification of indebtedness, or other indicia of any continuing alleged debt.

62. As a further result of this inexcusable delay and as a result of all Defendants' actions confirming that the AEGIS Guaranty was released, important records in this case cannot be located. This prejudicial effect, in turn, has made it difficult to resolve this conflict expeditiously and has, in fact, made this litigation necessary to protect Mr. Farouki from unwarranted and illegal attempts to seize his property and from further impairment of his reputation and credibility.

63. Because of Defendants' inexcusable delay in seeking to collect on the AEGIS Guaranty and the undue prejudicial effect of this delay, any legal action to enforce or collect on the AEGIS Guaranty is barred by the doctrine of laches.

## COUNT IV
### Promissory Estoppel

64. Plaintiffs reallege and incorporate paragraphs 1-63 as if fully set forth herein.

65. Between 1991 and 1993, Mr. Farouki and Mr. Old, acting on behalf of PIBC and Petra Bank, renegotiated the terms of the AEGIS Guaranty. In 1993, the parties agreed that Mr. Farouki had satisfied the terms for the release of the guaranty, Mr. Old promised to cause the

release of the AEGIS Guaranty, and the AEGIS Guaranty was released.

66. Mr. Farouki reasonably relied on Mr. Old's promise and the release and, in turn, released his and AEGIS' causes of action against PIBC relating to the bank's failure to meet its lending obligations in connection with the credit facility agreement between AEGIS and PIBC and AEGIS' plan of reorganization. Enforcement of Mr. Old's promise and the release would be in the public interest and would prevent further injustice.

## COUNT V
### Injurious Falsehood
### (Defendant Old)

67. Plaintiffs reallege and incorporate paragraphs 1-66 as if fully set forth herein.

68. In 1993, Mr. Old negotiated the release of the AEGIS Guaranty.

69. Mr. Old has been the General Manager of PIBC since 1991. Mr. Old has visited Mr. Farouki's offices many times since 1993 in connection with other mutual business interests. Mr. Old has in his possession or control records reflecting Mr. Farouki's home address and primary business address. Until 2007 or 2008, neither Mr. Old nor his co-defendants issued a single demand letter or statement of account concerning the AEGIS Guaranty or sought to collect on this alleged debt in any way.

70. Recently, Mr. Old reported to Petra Bank and other individuals that the AEGIS Guaranty remains outstanding. He was aware, at the time of his report, that Petra Bank would try to collect the debt, which it has done, causing damages to Mr. Farouki in an amount to be determined at trial. Because Mr. Old himself negotiated the release of the AEGIS Guaranty, he knows that his representation was false.

71. On information and belief, by agreement with Petra Bank, Mr. Old is entitled to retain considerable amounts of all collections received from PIBC debts. As a result of this

compensation arrangement, Mr. Old stands to benefit directly from the seizure of Mr. Farouki's assets.

72. By the conduct described above, Mr. Old has knowingly published a false statement harmful to Mr. Farouki's interests and should be held liable for damages resulting from his conduct.

## COUNT VI
### Defamation
### (Defendant Old)

73. Plaintiffs reallege and incorporate paragraphs 1-72 as if fully set forth herein.

74. In 1993, Mr. Old negotiated the release of the AEGIS Guaranty.

75. Recently, Mr. Old reported to Petra Bank and, it is believed, members of the Central Bank of Jordan and other prominent members of the Jordanian banking and business community, that Mr. Farouki is fifteen years delinquent in repaying a multi-million dollar debt resulting from the AEGIS Guaranty. By these actions, Mr. Old has made false and defamatory statements concerning Mr. Farouki's financial well-being to Petra Bank and, on information and belief, others, without privilege to do so.

76. Because he negotiated the release of the AEGIS Guaranty himself, Mr. Old knew his statements were false and defamatory when they were made and those statements have caused Mr. Farouki damages in an amount to be determined at trial.

## COUNT VII
### Tortious Interference with Contract
### (Defendant Old)

77. Plaintiffs reallege and incorporate paragraphs 1-76 as if fully set forth herein.

78. In 1993, PIBC and Mr. Farouki agreed that Mr. Farouki had satisfied the terms for the release of the AEGIS Guaranty. In exchange for Mr. Farouki's and AEGIS' release of all

claims against PIBC relating to the bank's failure to provide additional funding during AEGIS' reorganization, PIBC agreed to release Mr. Farouki from his guaranty.

79. Now, Mr. Old has reported to Petra Bank that the AEGIS Guaranty remains outstanding. He was aware, at the time of his report, that Petra Bank would try to collect the debt – which it has done – effectively breaching the contract entered between Mr. Farouki and PIBC. Because Mr. Old himself negotiated the release of the AEGIS Guaranty, he knew that his representation was false.

80. By his actions, Mr. Old has intentionally procured PIBC's breach of the settlement agreement entered between PIBC and Mr. Farouki concerning the release of the AEGIS Guaranty and the release of AEGIS' claims against PIBC. As a result of this breach caused by Mr. Old, Mr. Farouki has suffered damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, having set forth his complaint against Defendants, Plaintiff A. Huda Farouki respectfully requests the following relief:

1. Entry of a declaratory judgment pursuant to 28 U.S.C. § 2201(a) decreeing the following:

    a. the AEGIS Guaranty was released by Defendants;

    b. Defendants are barred from initiating any legal action to enforce or collect on the AEGIS Guaranty as a result of the running of the statute of limitations; and

    c. Defendants are barred from initiating any legal action to enforce or collect on the AEGIS Guaranty as a result of laches;

2. Entry of an order enjoining Defendants from initiating any future efforts to collect on the AEGIS Guaranty as a result of Defendants' release of the AEGIS Guaranty, the running of the statute of limitations, and laches;

3. Damages in an amount to be determined at trial;

4. Such further relief as this Court finds just and equitable.

Dated: December 9, 2008

By: _____
Robert J. Mathias (#436092)
David Clarke, Jr. (#396002)
Grayson D. Stratton (#976910)
DLA PIPER LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
Phone: (202) 799-4000
Fax: (202) 799-5000

Attorneys for Plaintiff
A. Huda Farouki